# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 920 | **DATE** | 7/31/2002 |
| **CASE TITLE** | ED SMITH,et al vs. THE CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/29/02 at 9:30A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the following claims are dismissed without prejudice for lack of subject matter jurisdiction: (1) all plaintiffs' First Amendment claims; (2) all plaintiffs' Fourteenth Amendment claims for future injunctive relief; (3) all plaintiffs' Fourteenth Amendment claims for declaratory relief; (4) the Fourteenth Amendment damage claims of all plaintiffs but Mr. Garcia. Moreover, there is no genuine issue of material fact on Mr. Garcia's Fourteenth Amendment damage claim or on all plaintiffs' race-based Fourteenth Amendment claims for present injunctive relief. The City's motion for summary judgment on those claims is, therefore, granted. There are, however, genuine issues of material fact on all plaintiffs' speech-based Fourteenth Amendment claims for present injunctive relief. The City's motion for summary judgment on those claims is, therefore, denied. Finally, the City's motion to strike portions of plaintiffs' submissions is dismissed as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | AUG 0 1 2002 | |
| | Notified counsel by telephone. | date docketed | 168 |
| ✓ | Docketing to mail notices. | TF6 | |
| | Mail AO 450 form. | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | |
| | | date mailed notice | |
| TBK | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

U.S. DISTRICT COURT
CLERK
02 JUL 31 AM 9: 43
FILED-ED 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ED SMITH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 94 C 920 |
| | ) | Paul E. Plunkett, Senior Judge |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, twenty-three current or former aldermen of the City of Chicago, have sued the City for its alleged violations of their First and Fourteenth Amendment rights. The case is before the Court on the City's Federal Rule of Civil Procedure 56(c) motion for summary judgment and its motion to strike portions of plaintiffs' submissions. For the reasons set forth below, the summary judgment motion is granted in part and denied in part as to the claims that are justiciable and denied as to the claims that are not, which are dismissed for lack of subject matter jurisdiction. The City's motion to strike is dismissed as moot.

## Facts[1]

In 1991, the Chicago City Council was required by law to draw a new map of the ward boundaries. (Def.'s LR 56.1(a) Stmt. ¶ 5.) The council members could not agree on a map, however, so twenty-eight aldermen, nearly all of whom are white and sympathetic to the Daley

---

[1]Unless otherwise noted, these facts are undisputed.

administration ("the administration aldermen"), submitted a proposed map for a referendum vote. (Id.; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 4.) Another group of aldermen, nearly all of whom are African American and plaintiffs in this case ("the opposition aldermen"), submitted an alternate proposed map. (Def.'s LR 56.1(a) Stmt. ¶ 5; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 5.) On March 17, 1992, City voters approved the map submitted by the administration ("the referendum map"). (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 14.)

Three lawsuits ensued: (1) Barnett v. Daley, which was filed by several African-American voters who claimed, among other things, that the referendum map violated the Voting Rights Act (Def.'s LR 56.1(a) Stmt. ¶ 6); (2) Smith v. Daley, which was filed by the plaintiffs in this case who asserted a Voting Rights Act claim on behalf of all African-American residents of the City (id. ¶ 7); and (3) Bonilla v. City Council of the City of Chicago, which was filed by several Latino voters who claimed that the referendum map violated their rights (Def.'s LR 56.1(a) Stmt. ¶ 8). Though they were later dismissed from the suit, all of the City's aldermen were named as defendants in Barnett. (Id. ¶ 6; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 21.) None of the aldermen was named as a defendant in either Smith or Bonilla. (Def.'s LR 56.1(a) Stmt. ¶¶ 7, 8.)

Both the administration aldermen and the opposition aldermen retained private counsel to represent them in the Barnett suit. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 16-18.) The City paid the attorneys' fees of the administration aldermen, both when they were defendants in that suit and later, when they voluntarily intervened in it. (Id. ¶¶ 20-21.) The City also paid the administration aldermen's legal expenses when they intervened in Smith and Bonilla, the cases in which they had not been named as defendants. (Id. ¶ 36; Def.'s LR 56.1(a) Stmt. ¶ 10.)

The City did not pay any of the legal expenses incurred by the opposition aldermen in Barnett, even those that were incurred when the aldermen were defendants in the suit. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 22.) Moreover, the City rejected the requests of plaintiffs Munoz, Watson and Haithcock, who became aldermen in 1993, to reimburse any legal expenses they might incur if they intervened in the remap suits. (Id. ¶ 36.)

The City's proffered reason for refusing to make those payments was that "there is no basis in the Municipal Code of the City of Chicago to . . . . authorize the payment of legal fees for those persons [who sue the City]." (Exs. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J., Tab B, No. 6, Pls.' Ex. 29, 2/16/93 Letter to Bloom from Burke; see id., Tab B, No. 7, Pls.' Ex. 30, 3/16/93 Letter to Bloom from Burke ("I have not found any language in the Municipal Code to authorize the Committee on Finance to pay the fees of outside lawyers hired to sue the City of Chicago, its officials and employees."); id., Tab B, No. 9, Pls.' Ex. 32, 3/16/93 Letter to Watson from Burke (stating that section 2-152-170 of the Chicago Municipal Code "authorizes appointment of private legal counsel only to defend against an action brought against an official or employee."); Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 38.[2]) The City, however, paid the legal expenses incurred by the administration aldermen when they sued the City over council voting procedures when Harold Washington was mayor. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 39(4).[3]) Moreover, the City's budget ordinance for the last ten years has contained at least five different line items for legal assistance or services to the City Council and three "finance general" line items pertaining to professional

---

[2]The City denied the facts asserted by plaintiffs in this paragraph without any citation to the record. By operation of Local Rule 56.1, therefore, the City is deemed to have admitted them.

[3]See n.2.

- 3 -

services, from which the administration aldermen's legal expenses for the Smith and Barnett cases were paid.  (Pls.' LR 56.1(b)(3) (B) Stmt. ¶¶ 42, 44, 54; Def.'s Resp. Pls.' LR 56.1(b)(3)(B), Ex. B, Steve Hughes Aff. ¶ 3.)

Ultimately, the City prevailed in Bonilla and the parties to Smith and Barnett entered into a consent decree that modified the referendum map.  (Def.'s LR 56.1(a) Stmt. ¶¶ 11-12.)  The court ruled that the Smith and Barnett plaintiffs had prevailed, within the meaning of 42 U.S.C. § 1988, and awarded them more than $8 million in fees and costs.  (Id. ¶¶ 13-17.)  Plaintiffs contend, however, that the fee award did not include approximately $300,000.00 of fees and costs they incurred in those suits.

In this suit, plaintiffs claim that the City's failure to pay their legal expenses violated their First and Fourteenth Amendment rights.  They seek damages, a declaration that the City's conduct violated their rights and present and future injunctive relief.  The City contends that this case no longer constitutes a justiciable controversy and, even if it does, it fails on the merits.

## **The Legal Standard**

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  At this stage, we do not weigh evidence or determine the truth of the matters asserted.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  We view all evidence and draw all inferences in favor of the non-moving party.  Michas v. Health Cost Controls

of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

## Discussion

### Motion to Strike

The City moves to strike: (1) the portions of plaintiffs' brief and LR 56.1 fact statements that rely on Professor Dick Simpson's testimony about the City's motives for its conduct; and (2) the references in their brief to statements the City allegedly made during settlement negotiations. As the City points out, the Court previously ruled that Professor Simpson was not competent to provide motive testimony, (see Exs. Supp. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J, Tab G, 4/9/98 Order at 13-14), and statements made during settlement negotiations are inadmissible, see FED. R. EVID. 408. The Court did not, however, consider either Professor Simpson's motive testimony or the settlement negotiation statements in deciding the summary judgment motion. The City's motion to strike, is therefore, dismissed as moot.

### Summary Judgment Motion

The City contends that this case is moot because the fee award in the remap cases provided plaintiffs all of the relief they request. The Court disagrees. There is no dispute that the City paid most of plaintiffs' legal expenses pursuant to the fee award in Barnett but, viewed favorably to plaintiffs, the record suggests that the following amounts remain unpaid: $179,418.07 in expert

witness fees (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 86), $100,842.50 in additional legal fees (id. ¶¶ 87-88, 90-91) and $937.50[4] in additional costs (id. ¶ 89).

The expert fees and additional costs are not actually in dispute, the City says, because plaintiffs have not made a claim for them in their complaint. While that is true, it is not a fatal defect. Federal Rule of Civil Procedure 15(b) permits the Court to consider evidence on issues not raised in the pleadings if doing so helps to resolve the merits of the case and does not prejudice the opposing party. The basis for plaintiffs' expert fees and costs claims – that the City unconstitutionally preferred one group of aldermen over the other – is the same as the basis for their fees claims. Thus, evidence pertaining to the expert fees and costs bears directly on the merits of the case. Moreover, the City has had this evidence for years (Def.'s Resp. Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 86), so it will not be prejudiced if the Court considers it in connection with the summary judgment motion. In short, the expert fees and additional costs are in dispute in this case, a dispute that was not mooted by the Barnett fee award.

The City also contends that there is no live controversy over the additional legal fees. Plaintiffs may not recover the $44,000.00 they spent on pre-litigation activities, the City says, because they made no claim for them in their complaint and, in any event, the City did not pay for pre-litigation services rendered by counsel for the administration aldermen. In the City's view, the $34,442.50 loss that resulted from the Barnett court's reduction of plaintiffs' counsel, Judson Miner's, billing rate is also not at issue. That rate adjustment "is not an injury," the City says, but

---

[4]In their statement of additional facts, plaintiffs state that the amount of unpaid costs is $999.50. (See Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 89 (citing Barnett v. City of Chicago, No. 92 C 1683, 1993 WL 138813, at *4-6 (N.D. Ill. Mar. 5, 1999).) According to the Court's calculations, however, the actual amount of unpaid costs is $937.50.

"a market reality." (City of Chicago's Reply Br. Supp. Renewed Mot. Summ. J. at 3.) The City also discounts plaintiffs' claim for the $15,000.00 that Mr. Miner agreed to forego to foster settlement of the remap cases because he "cannot now rescind his word." (Id.) Similarly irrelevant, in the City's view, is the $7,000.00 allegedly owed to Matthew Piers, former Alderman Garcia's attorney. Mr. Piers has waived his rights to recover that sum, the City says, by failing to continue to ask for its payment after the City rejected his initial requests.[5] (Id. at 3-4.)

The City's argument, in essence, is that there is no controversy over these additional fees because plaintiffs are not entitled to recover them. That may be true, but it does not mean that the dispute over them has ended. "A case is moot if there is no possible relief which the court could order that would benefit the party seeking it." United States v. Balint, 201 F.3d 928, 936 (7th Cir. 2000) (internal quotation marks and citation omitted). Unless Mr. Miner and Mr. Piers have completely absolved plaintiffs of their obligation to pay these fees, awarding those amounts to plaintiffs or enjoining the City to pay their counsel are potential forms of relief that would benefit plaintiffs.[6]

Even if plaintiffs did suffer some injury, the City contends that it is not substantial enough to support a constitutional claim. Once again, the Court disagrees. "The maxim *de minimis non curat lex* . . . . place[s] outside the scope of legal relief the sorts of intangible injuries normally small and invariably difficult to measure that must be accepted as the price of living in society. . . ." Swick

---

[5]Apparently, filing a lawsuit to recover these fees does not, in the City's eyes, constitute a demand for payment.

[6]The City's payment of the administration aldermen's legal fees for the remap cases has, however, mooted plaintiffs' requests for an injunction prohibiting the City from making those payments. (See Compl. ¶¶ 73B, 78B, 83B, 87B, 92B.)

v. City of Chicago, 11 F.3d 85, 87 (7th Cir. 1993). It is not the size of an injury that animates the *de minimis* doctrine, our court of appeals explained, but its amorphousness:

> [I]f a loss is not only small but also indefinite, so that substantial resources would have to be devoted to determining whether there was any loss at all, courts will invoke the *de minimis* doctrine and dismiss the case, even if it is a constitutional case. . . . The maxim's design is to prevent expensive and mischievous litigation, which can result in no real benefit to complainant, but which may occasion delay and injury to other suitors. It has little or no proper application to cases in which the monetary cost of the loss is, though tiny, readily determinable.

Hessel v. O'Hearn, 977 F.2d 299, 303 (7th Cir. 1992) (internal quotation marks and citations omitted). The monetary loss claimed here is both substantial and readily determinable. Accordingly, the *de minimis* doctrine, as described in Hessel, does not apply.

Indefinable injuries are not, however, the only ones to which the *de minimis* label is applied. It is also used "to denote types of harm, often but not always trivial, for which the courts do not think a legal remedy should be provided." Id. at 304. Such was the case in Swick, in which the court said that "[t]he [non-pecuniary] injury that results when a person is temporarily deprived of his right to wear a uniform and a badge, to carry a gun, to arrest people, and to carry out other functions of a police officer" is not a deprivation of property within the meaning of the Fourteenth Amendment. 11 F.3d at 87. Unlike that alleged in Swick, the injury alleged here, which results from intentional discrimination based on race and political viewpoint, is not too trivial to merit legal redress. See Hessel, 977 F.2d at 304 (noting that the *de minimis* doctrine has "little if any application to deliberate wrongs"). Thus, the *de minimis* doctrine does not doom plaintiffs' claims.

The next arrow in the City's quiver is standing. Plaintiffs have standing to pursue their claims if they have suffered, or imminently will suffer, an injury to a legally protected interest that can be traced to the City and is likely to be redressed by a decision in their favor. Lujan v. Defenders

of Wildlife, 504 U.S. 555, 560 (1992). Even if the outstanding fees and costs constitute an actionable injury, the City says, it is one that was suffered by plaintiffs' lawyers, not by plaintiffs themselves. Consequently, plaintiffs have no standing to sue for those amounts.

There is no dispute that Mr. Miner, who represented the bulk of the plaintiffs in the Barnett suit, did so "on a purely contingent basis." (Exs. Def.'s Mem. Law Supp. Renewed Mot. Summ. J., Ex. 18, Barnett Pls.' Pet. Atty's' Fees & Costs, Ex. 1, Miner Decl. ¶ 13; Def.'s LR 56.1(a) Stmt. ¶ 27; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 27.) Plaintiffs have offered no evidence to suggest that they remain, despite Mr. Miner's description of their financial arrangement, liable for some or all of the fees and expenses that remain unpaid. Absent such evidence, plaintiffs have not demonstrated that they were injured by the City's failure to pay Mr. Miner's bills. Thus, they have no standing to pursue their claims to recoup the amounts owed to him.

The same is not true, however, of plaintiff Garcia's claim for the $7,000.00 allegedly owed to his lawyer, Mr. Piers. There is no evidence that Mr. Piers has fully absolved Mr. Garcia, through a contingency agreement or otherwise, of his obligation to pay those outstanding fees. Accordingly, we must draw the reasonable inference that Mr. Piers expects payment from his client for the services he rendered. Therefore, plaintiff Garcia has standing to pursue his claim for the money owed to Mr. Piers.

Even if they do not have standing to seek monetary relief, plaintiffs contend that their First Amendment claims for injunctive and declaratory relief remain viable. (See Compl. ¶¶ 73A, 83A (seeking declaration that the City's conduct violated their First Amendment rights); id. ¶¶ 73C, 83C (seeking injunction requiring the City to pay legal fees they incurred in the remap cases).) The injury that plaintiffs say support these claims is the chilling effect the City's conduct has had on their

freedom of speech. (Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J. at 21.) There is, however, no evidence to suggest that any chilling occurred. The City's failure to subsidize plaintiff's speech did not prevent them from participating, indeed prevailing, in the remap suits.[7] Moreover, there is no evidence that the City's conduct caused any of the plaintiffs to refrain from speaking out about redistricting or inhibited them in any way from expressing their views on any other topic. The only evidence plaintiffs have offered on the alleged "chill" is Alderman Preckwinkle's testimony that the City's actions "would make [her] think twice" about engaging in a redistricting battle in the future. (Exs. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J., Tab A, No. 12, Preckwinkle Dep. at 74.) That statement, however, is speculation about possible future injury, not evidence of a present one. As such, it does not give Alderman Preckwinkle, let alone the other plaintiffs, standing to pursue their First Amendment claims for declaratory and injunctive relief. Laird v. Tatum, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.")

Plaintiffs seek similar relief for their Fourteenth Amendment claims. (See Compl. ¶¶ 78A, 87A, 92A (seeking declaration that the City's conduct violated their Fourteenth Amendment rights); id. ¶¶ 78C, 87C, 92C) (seeking injunction requiring the City to pay the legal fees incurred by the plaintiffs in the remap cases).) The injury that supports those claims, plaintiffs say, is the City's failure to treat them equally under the ordinances that permit payment of aldermanic legal fees because of their political views and race. This time plaintiffs are on solid ground. With respect to their claims that the City denied them equal treatment because of their race, that discrimination itself

---

[7] Though the the City refused to appoint counsel for plaintiffs Haithcock, Watson and Munoz, to intervene in the remap suits, (see Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 31-35), there is no evidence that the City's failure to do so prevented them from participating in those suits.

is sufficient injury to confer standing for an equal protection claim. Heckler v. Mathews, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore less worthy participants in the political community can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.") (internal quotation marks and citation omitted). Moreover, as the Heckler Court observed, "when the right invoked is that of equal treatment, the appropriate remedy is a mandate of equal treatment." Id. at 740 (internal quotation marks, emphasis and citation omitted). Thus, plaintiffs' injury can be redressed by an injunction requiring the City to pay their attorneys' fees in the remap cases. Plaintiffs, therefore, have standing to seek injunctive relief for the City's alleged racial discrimination.

They also have standing to pursue injunctive relief for their claims that the City denied them equal protection because of their opposition to the referendum map. The City's alleged refusal to pay plaintiffs' legal fees pursuant to its ordinances forced them to file this suit, a burden not shared by the aldermen whose redistricting views the City favored. The unequal treatment under the ordinances coupled with the burden of having to litigate to vindicate their rights is sufficient injury to confer standing for those equal protection claims. Sherwin Manor Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216, 1221-22 (7th Cir. 1994) (state surveyors' false report about condition of nursing home, which required the home to engage in additional administrative processes to retain its certification, was sufficient injury to confer standing for equal protection claim). Moreover, an injunction requiring the City to pay the legal fees plaintiffs incurred in both the remap suits and this one would

redress that injury. Thus, plaintiffs have standing to pursue their speech-based equal protection claims.

Plaintiffs do not, however, have standing to seek an injunction barring the City from treating them unequally in the future. Plaintiffs' standing to seek an injunction against future conduct cannot be premised on "[p]ast exposure to illegal conduct," O'Shea v. Littleton, 414 U.S. 488, 495 (1974), or "hypothetical speculation and conjecture that harm will occur in the future," Palmer v. City of Chicago, 755 F.2d 560, 571 (7th Cir. 1985). Rather, plaintiffs have such standing only if they can demonstrate that there is a real and immediate threat that they will be denied equal treatment in the future under the ordinances pertaining to payment of aldermanic legal fees. See generally City of Los Angeles v. Lyons, 461 U.S. 95 (1983).

Plaintiffs have not made the requisite showing. They have not identified any pending or threatened litigation that pits them against the administration or any political issue that does so and is likely to erupt in litigation. Instead, they argue that their historical antagonism to the administration's agenda and the City's failure to treat them equally in the remap cases warrants an injunction ordering the City to treat them fairly in the future. The City's past conduct and plaintiffs' speculation as to future events do not, however, amount to a real and immediate threat that the City will apply the legal fees ordinances unequally in the future. Plaintiffs do not, therefore, have standing to seek future injunctive relief.

Nor do they have standing to seek declaratory relief for their equal protection claims. Though plaintiffs have suffered a concrete injury, a declaration that the City's failure to pay their legal fees violated their equal protection rights would do nothing to redress it. Because the declaratory relief

plaintiffs seek would not redress the injury they claim to have suffered, they have no standing to pursue it.[8]

We turn now to the merits of plaintiffs' equal protection claims. To prevail on those claims, plaintiffs must show that: (1) they are members of a protected class; (2) the City treated them differently than similarly situated aldermen outside of the protected class; (3) and it did so intentionally because of plaintiffs' membership in the protected class. Sims v. Mulcahy, 902 F.2d 524, 538 (7th Cir. 1990).[9] The City contends, with respect to plaintiffs' speech-based claim,[10] that there is no evidence that plaintiffs constitute an identifiable class. As plaintiffs admit, they do not always vote identically and not all of them oppose the administration at every turn. Thus, the City says, they are not a "class" within the meaning of the equal protection clause.

The City's definition of class is too narrow. Plaintiffs do not have to be a cohesive group at all times or for all purposes to have a viable equal protection claim. As the Seventh Circuit has recognized, a class for equal protection purposes "can be defined by reference to the discrimination itself." Indiana State Teachers Ass'n v. Board of Sch. Comm'rs of the City of Indianapolis, 101 F.3d 1179, 1181 (7th Cir. 1996). Thus, by showing that they all opposed the referendum map favored by the City and were all denied payment of their legal fees under the City's ordinances, plaintiffs have demonstrated that they are a class within the meaning of the equal protection clause.

---

[8] As the Seventh Circuit made clear in Perry v. Sheahan, 222 F.3d 309, 314 (7th Cir. 2000), the redressability component of the Lujan standing formulation applies to claims for declaratory relief. Because none of the cases cited by plaintiffs discusses redressability, they are inapposite.

[9] The City does not argue that the requisites for municipal liability under 42 U.S.C. § 1983 are not met.

[10] The City contested the class element of plaintiffs' race-based equal protection claim for the first time in its reply brief. The argument is, therefore, waived.

Even if they are a class, the City contends that there is no evidence that plaintiffs were situated similarly to the administration aldermen. Though all of the aldermen were sued in <u>Barnett</u>, the City says plaintiffs were defendants in name only. Because their interests were aligned with those of the <u>Barnett</u> plaintiffs, plaintiffs were, in essence, suing the City. The ordinances governing the payment of aldermanic legal fees, the City says, only authorize payments to aldermen who are defending the City's interests, not to those who are plaintiffs or nominal defendants in suits against the City. It is that distinction, the City argues, that immunizes its dissimilar treatment of the two groups of aldermen.

As plaintiffs point out, neither of the ordinances pursuant to which the administration aldermen's fees were paid mentions the nominal/actual defendant distinction drawn by the City. The first ordinance ("the fees ordinance") permits fees to be paid to defend an alderman against a claim or action instituted against him. (Exs. Defs.' Mem. Law Supp. Defs.' Renewed Mot. Summ. J., Ex. 1, Compl., Ex. A, Chicago Municipal Code § 2-152-170.) It says nothing, however, about nominal defendants or "true" party alignment.

Nor does the second ordinance ("the budget ordinance"), which is nothing more than a series of line items with terse descriptions. In fact, the budget ordinance, which contains such line items as:

> (1) 15/2005.9010, for legal and other incidental contractual services, to be expended at the direction of the chairman of the finance committee;
> (2) 15/2010.9005, for the payment of legal fees pursuant to the fees ordinance, to be expended at the direction of the chairman of the finance committee;
> (3) 15/2010.9006, legal assistance to the council, to be expended at the direction of the chairman of the finance committee;
> (4) 15/2010.9010, for legal and other services, to be expended at the direction of the chairman of the finance committee;
> (5) 15/2010.9073, for contingent expense authorized by the chairman of the finance committee;

(6) 99/2005.0140, finance general, other operating expenses, professional and technical services;

(7) 99/2005.0931, finance general, payment of non-tort judgments and other legal expenses; and

(8) 99/2005.9007, finance general, ward remap studies and costs (Exs. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J., Tab B, No. 4, Pls.' Ex 19b at 18, 20, 22)

says nothing at all about the nature of the claims or proceedings for which legal fees may be paid.

The plain language of these ordinances casts some doubt on the validity of the City's interpretation. But the question is not whether the City's interpretation is correct, but whether the City adheres to that interpretation, regardless of the race or political views of the official seeking payment of legal fees. Viewed favorably to plaintiffs, the record suggests that the City does not.

It is undisputed that during the administration of Harold Washington, a group of aldermen, some of whom are administration aldermen, twice filed suit against the mayor over the validity of certain city council procedures and resolutions. (See Roti v. Washington, 450 N.E.2d 465 (Ill. App. Ct. 1983) ("Roti I"); Exs. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J., Tab B, No. 20, Roti v. Washington, 500 N.E.2d 463 (Ill. App. Ct. 1986) ("Roti II".) In both cases, the suing aldermen were represented by William Harte, who submitted his bills to the finance committee and received payment for them from a line item in the budget ordinance attributed to the city council and its committees. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 65.) In other words, contrary to the City's contention, the record suggests that it twice paid, pursuant to one of the ordinances identified by plaintiffs, the legal fees of certain aldermen who sued the City.

But proof of dissimilar treatment alone will not defeat the City's motion. To do so, plaintiffs must also show that the City chose to treat them less favorably than it treated the aldermen-plaintiffs in Roti because of their race or political views. Sims, 902 F.2d at 538. As evidence of discriminatory intent, plaintiffs offer the testimony of Professor Simpson, Alderman Bloom and

former Alderman Rush, that minority and opposition aldermen are not appointed to chair city council committees and do not have ready access to certain City services or to discretionary job placements within Chicago city government. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 39(5).[11]) Those facts, however, only support an inference of discrimination if the minority and opposition aldermen were otherwise qualified for, or entitled to, the chairmanships, services and job placements and the decisions to withhold those benefits from them were made by the same person or people who refused to pay plaintiffs' legal fees. There is no evidence to suggest that such is the case. In fact, the record says nothing at all about: (1) who selects committee chairs and the criteria used to make those selections; (2) the specific City services to which minority and opposition aldermen do not have ready access, who controls those services and what criteria are used to determine who will receive them; and (3) who awards discretionary job placements and the criteria used to do so. Absent such evidence, the fact that minority and opposition aldermen have not received certain benefits they have sought or to which they feel they are entitled does not support an inference of discriminatory intent.

Plaintiffs also contend that the data in Professor Simpson's expert report constitutes evidence of the City's discriminatory intent. Professor Simpson analyzed voting patterns in the Chicago City Council for the years 1989 through 1994. He concluded that the administration aldermen supported Mayor Daley on more than 90% of divided roll call votes, while plaintiffs did so less than half the time. (Exs. Supp. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J., Tab G, Simpson Rep. at 3-7.) He also said that there is a correlation between the race of the aldermen and their voting patterns: the white aldermen tend to support the administration while the minority aldermen do not.

---

[11]Plaintiffs also cite to Alderman Shaw's testimony in paragraph 39(5), but his examples of discriminatory treatment all relate to the City's failure to pay plaintiffs' legal fees in the remap cases.

(Id. at 3.) Based on those facts, and the historical impact of ward remapping, Professor Simpson concluded that increasing minority representation in the council would weaken Mayor Daley's control of the council because "minority aldermen have a strong probability of joining and supporting the Independents or Opposition bloc." (Id. at 9.)

This data, plaintiffs contend, suggest that the City intentionally discriminated against them because they supported a ward map that would increase minority representation in, and reduce the mayor's control of, the city council. The Court disagrees. Professor Simpson's conclusion that increased minority representation would weaken the mayor's position is based on the following suppositions: (1) that the remapping would impact the wards of "three of the most Pro-administration aldermen" (id. at 9); (2) that three minorities would be elected in their places; and (3) that the newly elected minority aldermen would be unsympathetic to the Daley administration (id.). There is no evidence, in Professor Simpson's report or elsewhere, to suggest that the confluence of these three events is inevitable or even likely. Absent such evidence, Professor Simpson's conclusion that increased minority representation would negatively impact the Daley administration is too speculative to support the inference that the City intentionally discriminated against plaintiffs to avoid it.

Plaintiffs also say that a pattern of discrimination exists from which intent can be inferred. As plaintiffs point out, the City not only paid the fees of the administration aldermen in these cases, but in five others as well: Ketchum v. Byrne, Ramos v. Chicago City Council, which was consolidated with PACI v. Daley, and the two Roti cases. It is undisputed, however, that the administration aldermen were defendants in Ketchum, Ramos and PACI. See Ketchum, 740 F.2d 1398, 1400 (7th Cir. 1984) ("Plaintiffs, including individual black and Hispanic residents of the City

of Chicago, sued several individual defendants and the City Council of the City of Chicago alleging that the 1981 redistricting plan for the aldermanic wards of Chicago violated section 2 of the Voting Rights Act . . . ."); Ramos, No. 90 C 7211, Min. Order (N.D. Ill. Jan. 8, 1991) (granting motion of various administration aldermen to intervene as defendants). That leaves the Roti cases. Though the administration aldermen were plaintiffs in those cases and the City paid their fees, two payments to aldermen-plaintiffs in the last twenty years is not a pattern of conduct from which an inference of discrimination can be drawn.

Finally, plaintiffs argue that Alderman Burke's statements to various plaintiffs that the Chicago Municipal Code authorized the payment of fees only to aldermen who were defendants, though he knew that the City had paid the fees of the aldermen-plaintiffs in Roti I & II, evidences discriminatory intent. Plaintiffs, however, have told us little about the Roti cases. We determined, by comparing the caption of an opinion in Roti II to that in Barnett, that eleven of the twenty-four Roti II plaintiffs are administration aldermen. The parties agree that most of the administration aldermen are white, thus it is reasonable to assume that most of the eleven administration aldermen who were plaintiffs in Roti II are also white. The record does not, however, disclose the race of the thirteen other Roti II plaintiffs or that of the Roti I plaintiffs. Under the circumstances, Aldermen Burke's statements that the Chicago Municipal Code does not authorize payment of legal fees to plaintiffs, in the face of his knowledge about the payments to the Roti plaintiffs, do not support an inference of racial bias.[12]

-----

[12]Because there is no other evidence of racial animus, the fact that most of the plaintiffs are black and most of the administration aldermen, and perhaps, the Roti plaintiffs, are white does not support an inference of racially discriminatory intent. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266 (1977) ("[Unless] a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation

They do, however, support the inference that he was biased against plaintiffs because of their opposition to the referendum map. There is no dispute that the City paid the fees of the aldermen-plaintiffs in the Roti cases or that plaintiffs reminded Alderman Burke of that fact when they requested payment of their fees in the remap cases. (See Exs. Supp. Pls.' Mem. Law Opp'n Def.'s Renewed Mot. Summ. J., Tab B, No. 5, Pls.' Ex. 29, 2/12/93 Letter to Burke from Bloom.) Yet, Alderman Burke continued to maintain that there was no City ordinance that would allow payment of fees for aldermen who sue the City. (See id., No. 7, Pls.' Ex. 30, 3/16/93 Letter to Bloom from Burke ("I have not found any language in the Municipal Code to authorize the Committee on Finance to pay the fees of outside lawyers hired to sue the City of Chicago, its officials and employees.").)

The City says that the two groups of aldermen-plaintiffs cannot be compared "given the difference in time, in City Council composition and in the desired goals of the respective litigations." (City of Chicago's Reply Br. Supp. Renewed Mot. Summ. J. at 10.) According to the City's interpretation of the fee payment ordinances, however, those differences are irrelevant. The sole factor that determines whether fees are paid, the City says, is whether an alderman sues or defends the City. Thus, plaintiffs here and those in the Roti cases are identical in the only respect that matters: they both sued the City.

The City's says that it treated the Roti plaintiffs more favorably than these plaintiffs because the former "sought declaratory judgments as to the validity of certain City Council resolutions and procedures" while that latter "were seeking judgments that members of the City Council engaged

---

appears neutral on its face . . . . impact alone is not determinative.").

in intentional race discrimination when they voted for [the referendum map]." (Id.) In other words, the City paid the Roti plaintiffs' fees because it found their claims less offensive than those asserted by plaintiffs in Barnett. That explanation – we only pay the legal fees of aldermen-plaintiffs if we deem the cause worthy – is virtually an admission that the City does not apply the fee payment ordinances in a content-neutral fashion. Given its contention that the ordinances forbid payments to plaintiffs, the City's payment of the Roti plaintiffs' fees suggests that its proffered reason for refusing to pay the remap plaintiffs' fees is a pretext for discrimination.

In short, plaintiffs have raised a genuine issue for trial on whether the City refused to pay their legal fees in the remap cases because of their opposition to the referendum map. The City's motion for summary judgment on plaintiffs' speech-based Fourteenth Amendment claims for present injunctive relief is, therefore, denied.

## Conclusion

For the reasons set forth above, the following claims are dismissed without prejudice for lack of subject matter jurisdiction: (1) all plaintiffs' First Amendment claims; (2) all plaintiffs' Fourteenth Amendment claims for future injunctive relief; (3) all plaintiffs' Fourteenth Amendment claims for declaratory relief; and (4) the Fourteenth Amendment damage claims of all plaintiffs but Mr. Garcia. Moreover, there is no genuine issue of material fact on Mr. Garcia's Fourteenth Amendment damage claim or on all plaintiffs' race-based Fourteenth Amendment claims for present injunctive relief. The City's motion for summary judgment on those claims is, therefore, granted. There are, however, genuine issues of material fact on all plaintiffs' speech-based Fourteenth Amendment claims for present injunctive relief. The City's motion for summary judgment on those claims is, therefore, denied. Finally, the City's motion to strike portions of plaintiffs' submissions is dismissed as moot.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

**DATED:** July 31, 2002