# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 920 | **DATE** | 6/10/2004 |
| **CASE TITLE** | Ed H. Smith, et al vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order. The City's motion for judgment as a matter of law on partial findings (Doc. No. 206-1) is denied and judgment is entered in favor of Plaintiffs in the amount of $246,354.07.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |

number of notices: 4

date docketed: JUN 1 5 2004

docketing deputy initials

6/10/2004 date mailed notice

ETV courtroom deputy's initials

CLERK, U.S. DISTRICT COURT

2004 JUN 14 PM 1:49

Date/time received in central Clerk's Office

ETV mailing deputy initials

**Document Number** 260

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ED H. SMITH, et al.,                          )
                                              )
                    Plaintiffs,               )
                                              )
          v.                                  )      No. 94 C 920
                                              )
CITY OF CHICAGO,                              )      Judge Rebecca R. Pallmeyer
                                              )
                    Defendant.                )

DOCKETED
JUN 15 2004

## MEMORANDUM OPINION AND ORDER

Twenty-three current or former aldermen of the City of Chicago have sued the City under

the First and Fourteenth Amendments for unequal treatment in the payment of attorneys' fees and

expenses in connection with litigation surrounding the 1992 remap of Chicago's ward boundaries.[1]

This case was filed on February 14, 1994 and assigned to Judge Plunkett, who supervised

discovery over a lengthy period before partially granting the City's motion for summary judgment

on August 1, 2002. *See Smith v. City of Chicago*, No. 94 C 920, 2002 WL 1770532 (N.D. Ill. Aug.

1, 2002), *amended in part*, 2003 WL 57035 (N.D. Ill. Jan. 7, 2003). The case was then reassigned

to this court on May 20, 2003 pursuant to 28 U.S.C. § 294(b). Following a bench trial on all

remaining issues, the City moved for judgment as a matter of law on partial findings, and both

parties seek judgment in their favor on all claims. For the reasons set forth here, the City's motion

is denied and judgment is entered in favor of Plaintiffs.

---

[1]       Plaintiffs are Ed H. Smith, Allan Streeter, Dorothy Tillman, Helen Shiller, John O.
Steele, Lawrence S. Bloom, Robert Shaw, Jesse J. Evans, Bobby L. Rush, Percy Giles, William
M. Beavers, Toni Preckwinkle, Rickey Hendon, Joe Moore, Arenda Troutman, Shirley A. Coleman,
Virgil E. Jones, Jesse Miller, Sam Burrell, Dexter Watson, Madeline Haithcock, Jesus Garcia, and
Ricardo Munoz. (Uncontested Facts ¶ 1 n.1.)

2(6)

## BACKGROUND

The facts of this matter as presented in Judge Plunkett's August 1, 2002 Memorandum Opinion and Order ("Order") were largely confirmed at trial. *See Smith*, 2002 WL 1770532, at *1-2. This opinion thus assumes the reader's familiarity with that decision.

In 1991, the Chicago City Council was required by law to draw a new map of the city's ward boundaries in accordance with the 1990 Census. *Smith*, 2002 WL 1770532, at *1; *Barnett v. Daley*, 809 F. Supp. 1323, 1326 (N.D. Ill. 1992). The council members could not agree on a map, so two groups of aldermen submitted their competing proposals for a referendum vote by Chicago voters, pursuant to Illinois state election law. The first group consisted of 28 predominantly white aldermen who were generally sympathetic to Mayor Richard M. Daley's administration. These "Administration Aldermen" promoted a map with 24 majority white wards, 19 majority African-American wards, and 7 majority Latino wards. *Id.*; (Tr. 69, 156, 197-98; Uncontested Facts ¶ 8.) The second group consisted of the 23 predominantly African-American aldermen who were at that time often at odds with the mayoral administration and who are Plaintiffs in this case. These "Opposition Aldermen" supported a map with 21 or 22 majority white wards, 21 or 22 majority African-American wards, and 7 or 8 majority Latino wards. *Id.*; (Tr. 69; Uncontested Facts ¶ 9.) On March 17, 1992, City voters approved the map submitted by the Administration Aldermen (the "Referendum Map"). *Id.*

### A. The Remap Litigation

Unhappy with this outcome, three groups responded by filing lawsuits. In *Barnett v. Daley*, No. 92 C 1683, nine African-American voters claimed the Referendum Map was unconstitutional and violated the Voting Rights Act, 42 U.S.C. § 1973. In *Smith v. Daley*, No. 92 C 2104 ("*Smith I*"), Plaintiffs in this case alleged a Voting Rights Act claim on behalf of all African-American residents of the City. Finally, in *Bonilla v. City Council of the City of Chicago*, No. 92 C 2666, six

Latino voters sought changes to the map that would have created additional wards "alleged to have sufficient population to permit Latino residents in those wards to elect the candidates of their choice." (Uncontested Facts ¶¶ 11-13.) All of the City's aldermen were named as defendants in *Barnett*, but the court later dismissed them from the suit in December 1992. *See Barnett v. Daley*, 809 F. Supp. 1323 (N.D. Ill. 1992); (Uncontested Facts ¶ 14.) None of the aldermen was named as a defendant in *Smith I* or *Bonilla*, but the Administration Aldermen voluntarily intervened as defendants in both cases. They also voluntarily intervened as defendants in *Barnett* after being dismissed from that suit. *Id.* (Uncontested Facts ¶¶ 11-14; DX 15.) Ultimately, all three cases were assigned to Judge Brian Barnett Duff of this court, and *Smith I* was consolidated with *Barnett*. (*Id.* ¶ 15.) The Second Amended Complaint in *Barnett*, filed in 1993, did not name any aldermen as defendants, but they remained in the case voluntarily as defendant-intervenors. (*Id.* ¶ 31.)

**B.     The Dispute Over Attorneys' Fees – *Smith II***

The Administration Aldermen and Opposition Aldermen separately retained private counsel to represent them in the aforementioned legal proceedings. *Smith*, 2002 WL 1770532, at *1. The Administration Aldermen were represented by the law firms of Jenner & Block, Pope & John, and Donald Hubert & Associates. (Uncontested Facts ¶ 27.) At the direction of Alderman Edward M. Burke, Chairman of the Finance Committee of the City Council, the City paid the attorneys' fees of the Administration Aldermen both when they were named as defendants in *Barnett*, and after they voluntarily intervened as defendants in that case and in *Smith I* and *Bonilla*. (*Id.* ¶¶ 30, 32.) In total, the City paid more than $16 million in legal fees on behalf of the Administration Aldermen. *Smith*, 2002 WL 1770532, at *1; (Tr. 579; PX 88, at 45-46; Uncontested Facts ¶ 23.)

The Opposition Aldermen were represented by Judson Miner of Miner, Barnhill & Galland. (Uncontested Facts ¶ 28.) On February 12, 1993, Alderman Lawrence Bloom sent a letter to Alderman Burke on behalf of the Opposition Aldermen requesting reimbursement for attorneys'

fees they incurred in connection with the *Smith I* litigation. (*Id.* ¶¶ 33, 34; PX 28.) Alderman Burke refused to pay those fees, stating in a February 16, 1993 letter that "there is no basis in the Municipal Code of the City of Chicago to . . . authorize the payment of legal fees for those persons [who sue the City]." (*Id.* ¶ 34; PX 29, Letter from Burke to Bloom of 2/16/93.) According to Alderman Burke,

> Section 2-152-170 of the Municipal Code[2] authorizes the payment of legal fees for City officials when an action has been brought against them for activities performed in the course of their employment. This Section does not authorize the payment of legal fees for those persons bringing the action.

(PX 29.) A month later, Alderman Burke reiterated these sentiments in another letter to Bloom dated March 16, 1993: "I have not found any language in the Municipal Code to authorize the Committee on Finance to pay the fees of outside lawyers hired to sue the City of Chicago, its officials and employees." (PX 30, Letter from Burke to Bloom of 3/16/93.)

Another alderman, Jesus Garcia, retained his own separate counsel, Matthew Piers of Gessler, Flynn, Fleischmann, Hughes & Socol, to represent his interests after being named as a defendant in *Barnett*. (Uncontested Facts ¶ 35.) Alderman Garcia, who by March 1993 was a state senator, took positions in the case that were different from any other party. (*Id.* ¶ 36; PX 17B.) Mr. Piers exchanged letters with Alderman Burke and Susan Lichtenstein, the City's Deputy Corporation Counsel, regarding Alderman Garcia's legal expenses, and on July 19, 1993, the City voluntarily paid some $74,479.20 in fees and costs Alderman Garcia incurred in connection with

---

[2]     Section 2-152-170 states:

If any claim or action, either civil or criminal in nature, is instituted against a current or former elected official, current or former appointed official or current or former employee of the city of Chicago or any agency of the city of Chicago where such claim arises out of any act or omission, made in good faith, occurring within the scope of such person's office or employment, the chairman of the committee on finance of the city council, with the approval an concurrence of the mayor, may at the request of such person appoint counsel to defend such person against any such claim or action.

4

the *Barnett* case. (PX 17, Letter from Piers to Burke of 9/15/92; PX 17A, Letter from Piers to Burke of 1/28/93; PXB, Letter from Piers to Lichtenstein of 3/3/93; PX 18, Letter from Burke to Piers of 7/19/93.) Alderman Garcia claims, however, that the City refused to reimburse approximately $7,000 in additional expenses arising from his legal representation in that case. (*Id.* ¶¶ 37, 38.)

Three additional aldermen, Dexter Watson, Madeline Haithcock, and Ricardo Munoz, all appointed in 1993 after the referendum vote, also asked Alderman Burke in March 1993 about the possibility of getting reimbursed for legal expenses if they decided to intervene in the redistricting litigation. *Smith*, 2002 WL 1770532, at *1; (PX 31.) By letter dated March 16, 1993, Alderman Burke informed Alderman Watson that § 2-152-170 of the Chicago Municipal Code "authorizes appointment of private counsel only to defend against an action brought against an official or employee." (Uncontested Facts ¶¶ 39-40; PX 32, Letter from Burke to Watson of 3/16/93.) Alderman Munoz testified that Alderman Burke told him during a brief conversation in the spring or summer of 1993 that the City would not pay his legal expenses if he chose to intervene in the litigation because he was "not part of the City Council when these [re-]maps were adopted." (Tr. 368-70.) Alderman Munoz sought leave to intervene as a plaintiff in the consolidated *Smith I/Barnett* cases in any event, enlisting the legal assistance of Mr. Piers. The court denied Alderman Munoz's request on December 22, 1994, and the City refused to pay his legal expenses. (Tr. 370-71; Uncontested Facts ¶ 42.)

On February 14, 1994, the Opposition Aldermen filed the instant lawsuit (*Smith II*) alleging that the City violated their First and Fourteenth Amendment rights by failing to pay their legal fees and expenses incurred in connection with *Barnett*, *Smith I*, and *Bonilla*, while at the same time paying those same expenses on behalf of the Administration Aldermen. The Opposition Aldermen sought fees for Judson Miner and Matthew Piers, a declaration that the City's failure to pay those fees violated their First Amendment right to free speech and Fourteenth Amendment right to equal protection of the laws, and present and future injunctive relief.

5

## C. The *Barnett*, *Smith I*, and *Bonilla* Decisions

While this action for fees was pending, the consolidated Voting Rights Act cases proceeded to trial before Judge Duff on February 28, 1996. Following a 48-day bench trial ending August 1, 1996, Judge Duff ruled in favor of Defendants on all claims in *Barnett*, *Smith I*, and *Bonilla* on June 9, 1997. *See Barnett v. City of Chicago*, 969 F. Supp. 1359 (N.D. Ill. 1997). On April 1, 1998, the Seventh Circuit affirmed the decision with respect to the *Bonilla* plaintiffs but vacated the decision with respect to the consolidated *Barnett/Smith I* plaintiffs. *See Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998).[3] On remand, the case was reassigned to Judge Elaine Bucklo who, after a three-day retrial, found that the Referendum Map violated the Voting Rights Act. *Barnett v. City of Chicago*, 17 F. Supp. 2d 753, 754 (N.D. Ill. 1998). After that ruling, the parties entered into a consent decree modifying the ward map. *Id.* at 759; Case No. 92 C 1683, Docket Nos. 747-53. The court awarded statutorily allowed attorneys' fees and costs to the plaintiffs (including the Opposition Aldermen) as "prevailing parties" under 42 U.S.C. § 1983. *See Barnett v. City of Chicago*, No. 92 C 1683, 1999 WL 138813 (N.D. Ill. Mar. 5, 1999); *Barnett v. City of Chicago*, 122 F. Supp. 2d 915 (N.D. Ill. 2000), *aff'd*, 3 Fed.Appx. 546, 2001 WL 135842 (7th Cir. Feb. 16, 2001). All told, the "combined total of the fees, costs and awards to Plaintiffs' attorneys for the Opposition

---

[3]        The Seventh Circuit found that the district court erred in reclassifying certain white majority wards as "multi-racial" under the theory that white aldermen were attentive to the interests of black voters in those wards. 141 F.3d at 703. Though undoubtedly true, the court stated, "the blacks would prefer to elect black aldermen and cannot." *Id.* Once those white majority wards were reclassified as such, the City's map produced 24 white majority wards (48%), 19 black majority wards (38%), and 7 Latino majority wards (14%). The population of Chicago, however, was 38% white, 39% black, and 20% Latino. *Id.* That did not end the inquiry in the Seventh Circuit's view because "citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of the [Voting Rights Act]." *Id.* at 704. Using that model, whites comprised 46% of the population, blacks 40%, and Latinos 11%. *Id.* Thus, Latinos were overrepresented in the City's map (securing a majority in 14% of the wards with only 11% of the population) and had "no basis for complaining." *Id.* at 705. Blacks, on the other hand, were underrepresented because the City's map gave them only 38% of the wards though they comprised 40% of the population. The judgment as to the black plaintiffs was therefore vacated and remanded to the district court. *Id.* at 706.

Aldermen in *Smith I* and to the Plaintiffs' attorneys in *Barnett* exceeds eight million dollars." (Uncontested Facts ¶ 51.) It is undisputed, however, that the court's award did not include an additional $246,354.07 in fees and costs incurred by the Opposition Aldermen, the amount at issue in this lawsuit. (*Id.* ¶¶ 20, 21.)

**D.    The *Smith II* Decisions**

  **1.    Motion for Summary Judgment**

On January 4, 2002, the City moved for summary judgment in the instant *Smith II* case arguing, among other things, that Plaintiffs lacked standing to pursue their claims and that they could not establish any equal protection violation. On August 1, 2002, Judge Plunkett granted the motion in part and denied it in part. The court held that Plaintiffs had no standing to pursue their claims to recover attorneys' fees owed to Judson Miner because he was representing them "on a purely contingent basis" and Plaintiffs offered no evidence that they remained liable to Mr. Miner for any outstanding fees. *Smith*, 2002 WL 1770532, at *5. There was no evidence of a similar contingency agreement between Mr. Piers and Alderman Garcia, however, nor any evidence that Mr. Piers had fully absolved Alderman Garcia of his obligation to pay the $7,000 in outstanding fees. Alderman Garcia thus had standing to pursue his claim for money owed. *Id.* As for Plaintiffs' standing to pursue injunctive and declaratory relief under the First Amendment, the court found no evidence, other than one alderman's speculation that the City's action "would make [her] think twice" about engaging in a redistricting battle in the future, that the City's refusal to pay attorneys' fees had any chilling effect on Plaintiffs' speech. Absent such evidence, the court stated, Plaintiffs did not have standing to pursue First Amendment claims for injunctive and declaratory relief. *Id.*

On the other hand, Plaintiffs did have standing to pursue injunctive relief for the City's alleged racial discrimination and speech-based equal protection violations. Those claims both arose from the City's "refusal to pay Plaintiffs' legal fees pursuant to its ordinances [which] forced

7

them to file this suit, a burden not shared by the aldermen whose redistricting views the City favored." *Id.* at *6. In the court's view, an injunction requiring the City to pay Plaintiffs' attorneys' fees in the remap cases would redress both (1) Plaintiffs' allegation that the City failed to "treat them equally under the ordinances that permit payment of aldermanic legal fees because of their political views and race"; and (2) Plaintiffs' allegation that the City "denied them equal protection because of their opposition to the referendum map." *Id.* (citing *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)) ("when the right invoked is that of equal treatment, the appropriate remedy is a mandate of equal treatment"). Plaintiffs did not, however, have standing to seek an injunction barring future unequal treatment, or any declaratory relief for their equal protection claims. *Id.* at *6-7.

Turning to the merits of Plaintiffs' equal protection claims, the court found that Plaintiffs demonstrated that they were an identifiable "class" because they all opposed the Referendum Map favored by the City and were all denied payment of their legal fees. *Id.* at *7. The City argued that Plaintiffs were not similarly situated to the Administration Aldermen because the ordinances governing payment of aldermanic legal fees only authorize reimbursement of attorneys' fees incurred by aldermen who are defending the City's interests, and not to those who are plaintiffs or "nominal" defendants. *Id.* In denying summary judgment on this issue, the court noted Plaintiffs' contrary evidence that the City twice paid the legal fees of certain other aldermen who had sued the City. *Id.* at *8. Specifically, during the administration of Mayor Harold Washington, a group of aldermen twice filed suit against the mayor over the validity of certain City Council procedures and resolutions. *Id. See Roti v. Washington*, 114 Ill. App. 3d 958, 450 N.E.2d 465 (1st Dist. 1983) ("*Roti I*"); *Roti v. Washington*, 148 Ill. App. 3d 1006, 500 N.E.2d 463 (1st Dist. 1986) ("*Roti II*"). The attorney representing the aldermen, William Harte, "submitted his bills to the finance committee and received payment for them from a line item in the budget ordinance attributed to the city

8

council and its committees." *Smith*, 2002 WL 1770532, at *8. (*See also* Uncontested Facts ¶¶ 52-58.)

The court next considered whether Plaintiffs had presented sufficient evidence of less favorable treatment based on their race or political views. On the issue of racial discrimination, Plaintiffs submitted an expert report from Dick W. Simpson, professor of political science at the University of Illinois at Chicago. Professor Simpson, who himself served as an alderman from 1971 to 1979 and who has published numerous articles and studies on the Chicago City Council, concluded that increasing minority representation in the Council would weaken Mayor Daley's control of the Council because "minority aldermen have a strong probability of joining and supporting the Independents or Opposition bloc." *Id.* at *9; Tr. 267-68, 272-73. The court found that conclusion too speculative in that it was based on certain suppositions that were neither inevitable nor even likely to occur. *Id.* The court therefore dismissed Plaintiff's race discrimination claims. Judge Plunkett was persuaded, however, that Plaintiffs' evidence that the City had paid the legal fees of the *Roti I* and *Roti II* plaintiffs supported an inference of bias against Plaintiffs because of their opposition to the Referendum Map. *Id.* at *10. The City argued that the *Roti* plaintiffs are not comparable to Plaintiffs in this case "given the difference in time, in City Council composition and in the desired goals of the respective litigations." *Id.* (quoting City of Chicago's Reply Brief to Supplemental Renewed Motion for Summary Judgment, at 10). The court disagreed: "plaintiffs here and those in the *Roti* cases are identical in the only respect that matters: they both sued the City." *Id.* at *11.

The court also rejected the City's argument that unlike the *Roti* plaintiffs, who "sought declaratory judgments as to the validity of certain City Council resolutions and procedures," Plaintiffs in this case "were seeking judgments that members of the City Council engaged in intentional race discrimination when they voted for [the referendum map]." *Id.* According to the court,

9

the City paid the *Roti* plaintiffs' fees because it found their claims less offensive than those asserted by plaintiffs in *Barnett*. That explanation – we only pay the legal fees of aldermen-plaintiffs if we deem the cause worthy – is virtually an admission that the City does not apply the fee payment ordinances in a content-neutral fashion.

*Id.*

### 2.    Motions for Reconsideration

After receiving Judge Plunkett's decision, both parties moved for reconsideration. On January 7, 2003, the court granted both motions in part and denied them in part. *See Smith v. City of Chicago*, No. 94 C 920, 2003 WL 57035 (N.D. Ill. Jan. 7, 2003). The court upheld its finding that Plaintiffs had standing to pursue a speech-based equal protection claim even though they lacked standing to proceed on a claim brought directly under the First Amendment. *Id.* at *1. In doing so, the court rejected the City's argument that Plaintiffs could not seek injunctive relief absent some showing of a threat of future injury, a threat the court had found lacking in the original motion for summary judgment. *Id. See also Smith*, 2002 WL 1770532, at *6-7. The court recognized that all injunctions seek prospective relief, but distinguished Plaintiffs' claims as follows:

> Plaintiffs' claim for an injunction barring the City from applying the fees ordinances in a discriminatory manner . . . seeks to prevent a future injury. Their claim for an injunction requiring the City to pay their lawyers' outstanding fees . . . seeks to redress an injury that has already occurred: their unequal treatment under the ordinances. Standing for the former injunction requires proof that the City is likely to apply the fees ordinances unequally in the future. Standing for the latter, like for an order of reinstatement, does not.

*Id.* at *1 (citing Dan B. Dobbs, DOBBS LAW OF REMEDIES § 2.9 at 225 (2d ed. 1993)) (comparing "preventive" and "reparative" injunctions).

The court also rejected the City's claim that an order to pay Plaintiffs' lawyers is the "equivalent of a damage award, a form of relief outside the realm of equity." *Id.* at *2. Relying on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the court found that the requested injunction would not compensate Plaintiffs for their constitutional injury, but would "accord them the equal treatment to which they are entitled." *Id.* (citing *Bowen*, 487 U.S. at 895) ("[d]amages are given to the plaintiff

10

to *substitute* for a suffered loss, whereas specific remedies are not substitute remedies at all, but an attempt to give the plaintiff the very thing to which he was entitled") (internal quotation and citation omitted). The court did clarify, however, that Plaintiffs could only be reimbursed for their fees incurred in connection with the remap litigation; reimbursement for their fees in this lawsuit "would not garner them equal protection under the ordinances." *Id.* at *3.

The City again insisted that Plaintiffs were not similarly situated to the Administration Aldermen because Plaintiffs sued the City while the Administration Aldermen defended it. *Id.* at *5. The court disagreed, finding evidence that the City had not previously relied on the suing/defending distinction in deciding whether to pay an alderman's legal fees. The City tried to discount those *Roti* cases as irrelevant, but the court found nothing in the record to suggest that the City's fee payment decisions were impacted by the City's suggested distinguishing factors, such as the passage of time or the change in administration. Indeed, Alderman Burke remained the decision-maker on fee requests from the time of *Roti* to the present lawsuit. *Id.* Unable to distinguish between aldermen who sue and those who defend the City, the court concluded that the City must offer some other rational basis for the difference in treatment between Plaintiffs and the Administration Aldermen. The City failed to do so and, thus, the court affirmed its denial of summary judgment on Plaintiffs' speech-based equal protection claims. *Id.* at *6.

Finally, the court affirmed its holding that, with the exception of Alderman Garcia, Plaintiffs lacked standing to pursue damage claims to recover their attorneys' fees. *Id.* at *6, 7. The court found, however, that Plaintiffs were eligible to recover nominal damages for any constitutional violation. *Id.* at *7 (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)) ("the denial of procedural due process [is] actionable for nominal damages without proof of actual injury").

11

### 3.    The Bench Trial

On May 20, 2003, the case was reassigned to this court pursuant to 28 U.S.C. § 294(b). The court held an eight-day bench trial on all remaining claims between September 17 and October 3, 2003. At the conclusion of Plaintiffs' evidence, the City moved for judgment as a matter of law on partial findings pursuant to FED. R. CIV. P. 52(c). Both parties also seek judgment in their favor based on the full trial.

### DISCUSSION

The City advances three primary arguments in support of its claim for judgment in its favor: (1) Plaintiffs failed to demonstrate that they are entitled to a reparative injunction; (2) Plaintiffs are not similarly situated to the Administration Aldermen in the remap cases; and (3) the City has several rational bases for treating Plaintiffs differently than the Administration Aldermen. Plaintiffs dispute these claims and insist that they have satisfied their burden of establishing a constitutional violation. The court considers each argument in turn.

### I.    Reparative Injunctive Relief

The City first asks this court to revisit Judge Plunkett's earlier rulings that Plaintiffs have standing to seek a reparative injunction ordering the City to pay their attorneys' fees. (Def. Mem., at 2; Def. Reply, at 2-3.)[4] The City argues that Plaintiffs have not demonstrated a "'concrete and particularized' injury to *themselves* which can be remedied by judicial relief" because the payments they seek will go to their attorneys. (*Id.* at 3.) The City also claims that Plaintiffs are merely seeking money damages and notes that Judge Plunkett has already determined that Plaintiffs lack standing to seek such relief. (*Id.* at 6.) In this court's view, however, that was not Judge Plunkett's

---

[4]    The Memorandum in Support of Defendant City of Chicago's Motion for Judgment as a Matter of Law on Partial Findings is cited as "Def. Mem., at ___." Defendant City of Chicago's Response to Plaintiffs' Post-Trial Brief and Reply in Support of its Motion for Judgment on Partial Findings is cited as "Def. Reply, at ___."

ruling: Judge Plunkett determined that the requested injunction "would accord [Plaintiffs] the equal treatment to which they are entitled" notwithstanding that the money would go to third parties. *Smith*, 2003 WL 57035, at *2. *See also Smith*, 2002 WL 1770532, at *6 ("plaintiffs' injury can be redressed by an injunction requiring the City to pay their attorneys' fees in the remap cases"). Moreover, Judge Plunkett specifically rejected the City's argument that an order to pay Plaintiffs' attorneys is the equivalent of a damage award. *Smith*, 2003 WL 57035, at *2 (citing *Bowen*, 487 U.S. at 895) ("[d]amages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies are not substitute remedies at all, but an attempt to give the plaintiff the very thing to which he was entitled").

The City next suggests that Plaintiffs lack standing because none of the categories of money they seek is fairly traceable to dissimilar treatment. (Def. Mem., at 3.) The City notes, for example, a lack of evidence that it paid pre-litigation fees for the Administration Aldermen comparable to those requested by Plaintiffs, or that it shared any common experts with Plaintiffs as it did with the Administration Aldermen. (*Id.*) The court disagrees that standing depends on a showing that Plaintiffs seek identical categories of relief as those paid on behalf of the Administration Aldermen. The gravamen of Plaintiffs' complaint is that they were treated unequally because the City refused to pay any of their attorneys' fees. There is no evidence in the record that the City would have paid Plaintiffs' legal fees if only they had requested properly compensable items.

Equally unavailing is the City's assertion that Plaintiffs lack standing because the specific funds with which their attorneys could have been paid are no longer available and would therefore constitute "substitute relief." (Def. Mem., at 6; Def. Reply, at 3-4; Tr. 439.) The City cannot divest Plaintiffs of standing by denying their relief for so long that the particular appropriation funds at issue become depleted or revert back to the general coffers. The mere fact that Plaintiffs may

ultimately receive equal treatment through payment of 2004 dollars as opposed to 1990's dollars does not convert their claim for injunctive relief into one for money damages.

With respect to Alderman Garcia, the City contends that the evidence at trial confirmed that he is not liable to Matthew Piers for any legal fees. Specifically, Mr. Piers testified that he never sent any bills to Alderman Garcia directly but, instead, submitted them to the City for payment. (Def. Mem., at 2 n.2; Tr. 203, 242.) The court does not see how this demonstrates that Alderman Garcia has no obligation to pay Mr. Piers' $7,000 in legal fees which remain due and owing on the firm's financial books. (Tr. 217-18, 220.) Significantly, Mr. Piers did not testify that he has no intention of seeking to recover any of these fees from Alderman Garcia in the event Plaintiffs are unsuccessful in this case. Thus, Alderman Garcia has standing to recover his outstanding attorneys' fees from the remap litigation.

Judge Plunkett thoroughly considered the standing issue not once but twice, and this court is not inclined to overturn his decisions. (Tr. 677.) The City has not offered any new evidence to support its standing challenge but simply asks this court to find that Judge Plunkett's analysis was wrong. The court finds that Judge Plunkett properly decided Plaintiffs' standing in this case and will not grant judgment in the City's favor on that basis.

## II.    Equal Protection

The parties agree that to establish an equal protection violation, Plaintiffs must show that (1) they are members of a protected class; (2) the City treated them differently than similarly situated aldermen outside of the protected class; and (3) the City acted with discriminatory intent. *See, e.g., Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir. 1990). Plaintiffs are not members of a suspect class, so they must also show that the discriminatory intent was not rationally related to a legitimate state interest. *See, e.g., Schroeder v. Hamilton Sch. Dist.,* 282 F.3d 946, 950-51 (7th Cir. 2002). The City argues that it did not treat Plaintiffs differently from any similarly situated

aldermen and that it has five rational bases for any differential treatment in any event. Plaintiffs insist that they are similarly situated to the Administration Aldermen and to the *Roti* aldermen, and that the City has failed to establish an actual basis for the different treatment that is not a pretext for unlawful discrimination.

## A.  Different Treatment of Similarly Situated Aldermen

The City argues that Plaintiffs are not similarly situated to the Administration Aldermen because in *Barnett* and *Smith I*, Plaintiffs were suing the City in their capacity as voters seeking to overturn a duly enacted city law, whereas the Administration Aldermen were defending the law in their official capacities as aldermen. (Def. Reply, at 5.) In the City's view, this readily explains Alderman Burke's position that the City could not reimburse Plaintiffs for legal fees but could do so for the Administration Aldermen. (*Id.* at 6.) *See also* Municipal Code § 2-152-170. The City claims, moreover, that if it had paid Plaintiffs' attorneys' fees but not those of the other private citizens who filed suit in *Barnett* and *Bonilla*, it faced a potential equal protection challenge from those private citizens. (*Id.*) As for the *Roti* cases, the City says, they are similarly inapposite because unlike Plaintiffs, the plaintiff-aldermen in *Roti* sued the City in their official capacities to resolve a dispute regarding City Council parliamentary procedure. (Def. Mem., at 8 n.6.)

The court is not convinced Plaintiffs are dissimilar from the Administration Aldermen and the *Roti* aldermen merely because the City has labeled them "voters." First and foremost, Plaintiffs and the Administration Aldermen were all named as defendants in the *Barnett* case based on their positions as aldermen. The City nevertheless refused to pay Plaintiffs' legal fees even for the period before they were dismissed from that case. In addition, the City never raised the voter-alderman distinction until the eve of trial, which casts serious doubt on its claim that Plaintiffs were denied reimbursement on that basis. Rather, this new semantic distinction appears to be the City's final attempt to avoid Judge Plunkett's ruling that the City cannot justify treating Plaintiffs differently

than the Administration Aldermen were treated merely because they adopted a position that was offensive to the administration. *Smith*, 2002 WL 1770532, at *11 ("[t]hat explanation – we only pay the legal fees of aldermen-plaintiffs if we deem the cause worthy – is virtually an admission that the City does not apply the fee payment ordinances in a content-neutral fashion").

The evidence is clear that all of the aldermen in the remap litigation had the same interest in the boundaries of their constituencies and were acting to achieve a map they believed to be fair. Alderman Toni Preckwinkle, for example, testified that she participated as a plaintiff in *Smith I* because she wanted "the best ward I could get." (Tr. 83.) In his February 12, 1993 letter to Alderman Burke, Alderman Bloom similarly noted that "[e]very alderman has an interest in making sure that the fairest possible map is adopted . . ." (PX 28.) Alderman Burke himself conceded that "every member of every legislative body certainly has an interest in his or her constituency and the boundaries of the constituency." (Tr. 483.) Moreover, the City cannot fairly argue that the Administration Aldermen had no interest in the litigation in their capacities as voters. The remap litigation arose within the scope of Plaintiffs' offices as aldermen, and the mere fact that Plaintiffs are also voters does not establish that they were ineligible to have their legal fees reimbursed based on their status as aldermen.

The City makes much of the fact that Plaintiffs only had standing to sue in *Smith I* based on their status as voters. (Def. Reply, at 8.) Plaintiffs' standing to sue in that case, however, is not dispositive as to whether they were also acting in their official capacities as aldermen to justify an award of legal fees under the Municipal Code. Nothing in the ordinances conditions payment on standing to sue as an official. *See, e.g.,* § 2-172-720 (allowing appointment of counsel to defend any "claim [that] arises out of any act or omission, made in good faith, occurring within the scope of [an official's] office or employment"). Moreover, Alderman Burke testified that his unwillingness to appoint counsel for Plaintiffs in the remap litigation was not based on the fact that the litigation involved voting rights. (Tr. 509.)

In sum, the court finds that Plaintiffs are similarly situated to both the Administration Aldermen and the *Roti* aldermen for purposes of their equal protection claims, and they were treated differently than those other aldermen because the City did not reimburse their legal fees.

**B.      Intentional Discrimination Based on Group Membership**

The City next argues that even if it treated Plaintiffs differently than similarly situated aldermen, Plaintiffs have not established that it was because of their membership in a protected class. Judge Plunkett earlier held that Plaintiffs could not pursue an equal protection claim based on race, *Smith*, 2002 WL 1770532, at *10, but he found sufficient evidence of a "class" based on the fact that Plaintiffs "all opposed the referendum map favored by the City and were all denied payment of their legal fees under the City's ordinances." *Id.* at *7. Plaintiffs claim that the City refused to pay their legal fees because it wanted to maintain control of the City Council "by squashing the views of the Opposition Aldermen and their ability to increase their numbers through a lawful ward remap." (Pl. Trial Br., at 59.) Plaintiffs recount the so-called "Council Wars" of the 1980's and argue that "the struggle over the new map was a struggle over the racial boundaries of the wards, and the racial boundaries determined whether the Daley forces controlled the City Council." (*Id.* at 60.)

According to Professor Simpson, between 1983 and 1994, an alderman's race tended to be a predictor of whether he or she would support or oppose the administration. In addition, there was a correlation between the racial population of a ward and the race of the alderman elected to serve in that ward. (Tr. 310, 313.) When Richard M. Daley became mayor, the Administration Aldermen voted with his administration an average of 95 percent of the time, compared to the Opposition Aldermen who voted with the administration only about 46 percent of the time on average. (Tr. 294-97.) With two exceptions, the Administration Aldermen are all white; with three exceptions, the Opposition Aldermen are all African-American. (Uncontested Facts ¶¶ 8, 9.) In

Professor Simpson's view, the map supported by the Opposition Aldermen would have created two to four new wards with an African-American majority. Given that African-American voters tend to select aldermen of the same race, the opposition map would likely have resulted in at least two new aldermen who did not support Mayor Daley a majority of the time, "ma[king] the mayor's control more tenuous." (Tr. 315-16.) Based on this data, Professor Simpson testified that "the struggle to keep the balance of power is what I think the remap was all about." (Tr. 362.)

The City argues that Plaintiffs were treated as a group only because "the City believed that there was no authority for paying attorneys' fees for voting rights plaintiffs suing the City absent a court order." (Def. Reply, at 12.) In the City's view, Plaintiffs at best speculate that Alderman Burke denied fees based on a belief that minority aldermen are more likely to oppose the administration's positions. The City acknowledges that "the present stems from, and is conditioned by, the past," but claims that Plaintiffs have not provided the "particularized linkage required to establish a predicate of constitutional liability." (Id. at 12-13.) Indeed, Alderman Burke's Deputy Chief, [now Judge] Lisa Ruble-Murphy, who drew the Referendum Map, testified that she did not intend to discriminate against Plaintiffs and had no reason to believe that the purpose of the Referendum Map was to preserve a "rubber stamp" City Council. (Tr. 737, 757.) The City also notes that Judge Plunkett rejected Plaintiffs' argument that Professor Simpson's report supports a conclusion that increased minority representation would negatively impact the Daley administration. (Def. Tr. Brief, at 7.)[5] See Smith, 2002 WL 1770532, at *9 (such a conclusion is "too speculative to support the inference that the City intentionally discriminated against plaintiffs to avoid it").

---

[5]     Defendant City of Chicago's Post-Trial Brief is cited as "Def. Tr. Brief, at __."

In this court's view, Plaintiffs have demonstrated that they were treated differently because of their membership in a group that opposed the Referendum Map espoused by the City, regardless of any alleged racial tension in the City Council. As Judge Plunkett explained,

> by showing that they all opposed the referendum map favored by the City and were all denied payment of their legal fees under the City's ordinances, plaintiffs have demonstrated that they are a class within the meaning of the equal protection clause.

*Smith*, 2002 WL 1770532, at *7. There can be no doubt that if Plaintiffs had sided with the Administration Aldermen on the Referendum Map and had intervened in the lawsuit to support that position, their legal fees would have been paid. This is sufficient to establish intentional discrimination based on group membership.

### C.    Rational Bases for Differential Treatment

The next question is whether the City had a rational basis for intentionally treating Plaintiffs differently than the other aldermen with respect to legal fees. The City offers five such rational bases and claims that any one of them demonstrates that the City acted for non-discriminatory reasons. Plaintiffs argue that all of the stated explanations are a pretext for unlawful discrimination.

### 1.    Standard of Review

Before turning to the merits of the City's rational bases, the court first addresses the proper standard for evaluating them. The City argues that to meet its burden, the City need only articulate some reason to explain its actions, regardless of whether that reason actually motivated the differential treatment. (Def. Mem., at 7-8.) Plaintiffs insist that the City must proffer evidence of its actual reasons for treating Plaintiffs differently, and that those reasons cannot be a pretext for discrimination. (Pl. Response, at 7-18; Pl. Trial Br., at 24-25.)[6] The Seventh Circuit has not squarely addressed the question of what standard is applicable to a rational basis equal protection

---

[6]    Plaintiffs' Response in Opposition to Defendant City of Chicago's Motion for Judgment as a Matter of Law on Partial Findings is cited as "Pl. Response, at ___."

claim challenging the enforcement of a statute, which prompted the City to seek certification of the issue for interlocutory appeal back on January 21, 2003.

In considering that motion, Judge Plunkett noted some "[d]ueling *dicta*" supporting both parties' positions. *Smith v. City of Chicago*, No. 94 C 920, 2003 WL 1989612, at *3 (N.D. Ill. Apr. 28, 2003). The City's position, for example, finds support in *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277 (7th Cir. 2003), in which the plaintiff brought an equal protection challenge to a decision of the Board of Zoning Appeals ("BZA") denying the plaintiff permission to open a methadone clinic in an area zoned for doctor's offices and hospitals. A jury awarded the plaintiff more than a million dollars in damages and the BZA appealed. *Id.* at 279. The Seventh Circuit reversed the judgment, finding no evidence of discriminatory intent by the BZA. Though not called upon to define the contours of rational basis review of an equal protection challenge to the enforcement of a statute, the court nonetheless observed that "the governmental entity does not need to articulate its reasoning when the decision is made. The burden is upon the challenging party to eliminate any 'reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* at 282 (quoting *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 367 (2001)).

In other cases, however, the Seventh Circuit has taken a different approach that supports Plaintiffs' position. In *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701 (7th Cir. 2002), for example, a school principal suspended two students for possessing cigarettes on school property. *Id.* at 704. One of the students committed suicide and her parents filed suit alleging, among other things, that the principal had treated their daughter differently than the other student by (1) failing to contact them at work to come pick her up, and (2) suspending her from three volleyball games and a field trip in addition to imposing a three-day suspension. *Id.* at 712. The court did not decide whether evidence of actual motivation is required for a rational basis equal protection claim challenging enforcement of a statute, but it found the different treatment of the two students

20

rational only after considering the school's evidence regarding the principal's motivations. *Id.* at 712-13. In Judge Plunkett's view, the case "casts doubt on the value of the *Discovery House dicta* as a predictor of the Seventh Circuit's future decisions." *Smith*, 2003 WL 1989612, at *2 (citing *Ciechon v. City of Chicago*, 686 F.2d 511, 522-24 (7th Cir. 1982)) (examining evidence to determine that two paramedics were similarly situated and no rational reason existed for City's decision to suspend only one of them).

Judge Plunkett ultimately denied the City's motion for interlocutory appeal, explaining that resolving the issue would not materially advance the end of this litigation. He expressed the opinion, however, that "the City must proffer evidence of its actual reasons for treating the two groups of aldermen differently." 2003 WL 1989612, at *3. According to Judge Plunkett,

> the rationale underlying the hands-off approach to judicial review in facial equal protection challenges does not seem to fit enforcement claims. . . In enforcement cases, like this one, the plaintiffs are not contesting a legislative choice. They are challenging one person's enforcement of those choices.

*Id.* At the same time, Judge Plunkett acknowledged that allowing fact-finding in such situations "could transform the routine business of state and local government into constitutional litigation, an undesirable outcome from any perspective." *Id.*

In arguing that the City must present evidence of its actual motivation for treating Plaintiffs differently than the Administration Aldermen, Plaintiffs distinguish between "facial" and "as applied" constitutional challenges. Citing case law from the Eleventh Circuit, Plaintiffs argue that the rational basis test applies to facial challenges to a statute, but that "it is legal error to apply that standard in 'as applied' equal protection claims such as the case at bar." (Pl. Response, at 7) (citing *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1367 (11th Cir. 1998)) (district court's use of rational basis standard was improper where complaint challenged zoning regulations as applied to plaintiff, not on their face). In Plaintiffs' view, "the use of indirect evidence to prove pretext and discriminatory intent is firmly rooted in Supreme Court precedent." (Pl. Response, at

11) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268 (1977)) (discussing "subjects of proper inquiry in determining whether racially discriminatory intent existed" in village's refusal to rezone property to a classification that would accommodate low- and moderate-income tenants). Thus, in determining whether a statute was applied in a discriminatory manner, Plaintiffs argue, the court should consider such factors as the impact of the official action, the historical background of the decision, the specific sequence of events leading up to the decision, departures from the normal procedural sequence, and departures from the normal substantive criteria. (*Id.* at 11-12) (citing *Village of Arlington Heights*, 429 U.S. at 267).

According to Plaintiffs, one case in particular "exemplifies Supreme Court and Seventh Circuit precedent as well as Judge Plunkett's rulings and nicely recaps the[se] governing principles." (Pl. Response, at 12.) In *Pack v. Clayton County, Georgia*, No. 1:93-CV-836-RRH, 1993 WL 837007 (N.D. Ga. Aug. 27, 1993), the plaintiffs sought to establish a "residential hospice" for chronically ill AIDS patients in a residential area of Clayton County. The county and certain individuals refused to give the plaintiffs a "conditional use permit" or a business license to operate the facility, so the plaintiffs filed suit under the Fair Housing Amendments Act, the Americans with Disabilities Act, and the Equal Protection clause. *Id.* at *1. Addressing all three claims together, the court set forth the traditional burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and stated:

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

1993 WL 837007, at *9 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). The court adopted the five factors for determining discriminatory intent articulated in *Village of Arlington Heights* and, finding the defendants' explanations for denying the permit "of dubious credibility," ruled in favor of the plaintiffs. *Id.* at *12, 13.

The City argues that *Pack* confuses the higher standard of scrutiny applicable in cases involving protected classes with the standard applicable in cases such as this, where there is no protected class. (Def. Reply, at 26.) The City also notes that by combining the analyses of the FHAA, ADA, and equal protection claims, the *Pack* court improperly imported the Title VII burden-shifting analysis into the equal protection context. (Def. Mem., at 12-13; Def. Reply, at 26) (citing *Schroeder*, 282 F.3d at 951) ("to the extent that Schroeder would like us to import Title VII employment discrimination standards into our equal protection analysis, we decline the invitation").

The court agrees that *Pack* is not particularly instructive on the issue of rational basis equal protection analysis for cases in this district that do not involve the FHAA and ADA. Indeed, the court is not aware of any non-ADA case that has cited *Pack*. Nor is the court inclined to follow Eleventh Circuit precedent that the rational basis standard does not apply to "as applied" statutory challenges at all. *See GJR Investments*, 132 F.3d at 1367. In this circuit, the proper standard is whether the City had a rational basis for its decision to treat Plaintiffs differently than the Administration Aldermen. *See, e.g., Schroeder*, 282 F.3d at 950-51. This does not mean, however, that the City can avoid liability by articulating any conceivable basis for the different treatment, even if that basis did not actually motivate the decision.

The City cites several cases for the proposition that any rational basis will do. *See, e.g., Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)) ("a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification'"); *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995) ("[a] person challenging the regulation of economic transactions must 'negative every conceivable basis which might support' the rule"); *Illinois Health Care Ass'n v. Illinois Dep't of Public Health*, 879 F.2d 286, 288-89 (7th Cir. 1989) ("[i]f the court can hypothesize plausible reasons for legislation that are within the legitimate goals of a government, nothing else is required to validate

23

the governmental classification and it does not matter whether the reasons advanced actually motivated the legislative action") (internal quotations omitted); *Baumgardner v. County of Cook*, 108 F. Supp. 2d 1041, 1055 (N.D. Ill. 2000). Plaintiffs claim these cases are inapposite because they all involve facial, as opposed to "as applied," statutory challenges. (Pl. Response, at 14-15.)

Without conceding the point, the City responds with three additional cases that address discriminatory enforcement of a statute: *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946 (7th Cir. 2002), *U.S. v. Harris*, 197 F.3d 870 (7th Cir. 1999), and *Herro v. City of Milwaukee*, 44 F.3d 550 (7th Cir. 1995). Those cases do not, however, establish that the City's actions must be upheld if there is any conceivable justification for Plaintiffs' differential treatment without any inquiry into the City's actual motives. In *Schroeder*, the court found no evidence of differential treatment based on the plaintiff's homosexuality, and concluded that the school district did not decline to implement a separate policy against sexual orientation due to any animus against the plaintiff or homosexuals in general. 282 F.3d at 954. The court stated that the manner in which the school district handled the plaintiff's complaints did not deny him equal protection, using language reflecting concern for the decision-maker's actual motivation. Specifically, the court noted evidence that "the school district was genuinely concerned about the treatment Schroeder experienced, and that it did what reasonably could be expected under the circumstances." *Id.* at 956.

In *Harris*, the court upheld a peremptory challenge exercised by the government to strike a disabled juror during voir dire. The court found a rational basis for the government's decision because "its stated concern, accepted by the district court, was that she would become drowsy and would not be able to pay attention during the trial. This is a legitimate concern that is rationally related to the provision of a fair trial for Harris." 197 F.3d at 876. In *Herro*, similarly, the court accepted "the plausibility of defendants' asserted reasons" for refusing a liquor license to one applicant but granting it to another. One of the defendants, a city alderman, submitted an affidavit expressing legitimate concern about having a responsible licensee, and unlike the comparative

24

applicant, the plaintiff did not procure the necessary work permits or submit renovation plans for his proposed tavern. 44 F.3d at 552.

In all three of these cases, the court looked to evidence of the defendants' actual motivation to determine whether they had a rational basis for the differential treatment. Like Judge Plunkett, this court believes that enforcement cases do not require the same hands-off approach to judicial review as facial equal protection challenges because the integrity of the legislative process is not at stake. *Smith*, 2003 WL 1989612, at *3. As discussed below, however, this issue may not be dispositive; regardless of whether the City's proffered explanations for its actions actually motivated the differential treatment, Plaintiffs have demonstrated that none qualifies as a rational basis under equal protection jurisprudence.

### 2. Rational Bases

The City has identified five rational bases to support its actions in this case: (1) "plaintiffs were suing in their private capacity as voters to overturn a duly enacted City law, whereas defendants were -- in their official capacity as aldermen -- defending it"; (2) "the relevant City decision-makers reasonably believed that there was no statutory authority for -- and no public purpose served by -- paying from City funds the attorneys' fees of plaintiffs who were suing the City and who could be expected to be awarded fees if their case proved to have any merit"; (3) "any suggestion that the *Smith* plaintiffs were defendants and for that reason entitled, as a matter of 'fairness,' to reimbursement of their attorneys' fees was reasonably viewed as a pretext to get money to fund their suit as voters against the City"; (4) "the City was within its rights to pay the attorneys' fees of the aldermen who defended the map ordinance because they agreed with the City's own position in the litigation that the map was lawful, and the City was not obligated to remain neutral in this dispute or to refrain from exercising its speech rights -- be it through direct speech or funding the party it favored in the litigation -- in support of its own legislation"; and (5) "funding

the aldermen plaintiffs in the remap litigation could itself give rise to an equal protection claim because it did not fund other plaintiffs in parallel suits contesting the City's map." (Def. Mem., at 8.) The court addresses each in turn.

### a. Voters Versus Aldermen

The City first argues that it rationally denied Plaintiffs' request for attorneys' fees because they sued the City as voters, and only aldermen are eligible for such payments. (Def. Reply, at 18-19.) *See, e.g.,* Municipal Code § 2-152-170. As noted earlier, this argument fails to explain the City's refusal to reimburse Plaintiffs even for the legal expenses they incurred when named as defendants in the *Barnett* case. *See infra,* at 27-29. In addition, nothing in the ordinances conditions payment on standing to sue as an official, or precludes payment whenever an alderman is wearing two hats (e.g., alderman and voter). *See, e.g.,* § 2-152-170 (allowing appointment of counsel to defend any "claim [that] arises out of any act or omission, made in good faith, occurring within the scope of [an official's] office or employment"). Moreover, Alderman Burke testified that his unwillingness to appoint counsel for Plaintiffs in the remap litigation was not based on the fact that the litigation involved voting rights. (Tr. 509.) Thus, the mere fact that the Opposition Aldermen were also voters in the remap litigation does not demonstrate that the City acted rationally in refusing to pay Plaintiffs' legal fees.

### b. Statutory Authority

The City next points to Alderman Burke's February 16 and March 16, 1993 letters to Alderman Bloom (which were apparently drafted by Lisa Ruble-Murphy). (Def. Reply, at 18; Tr. 777-78.) In his February 16 letter, Alderman Burke stated that "there is no basis in the Municipal Code of the City of Chicago to . . . authorize the payment of legal fees for those persons [who sue the City]," and that,

> Section 2-152-170 of the Municipal Code authorizes the payment of legal fees for City officials when an action has been brought against them for activities performed

26

in the course of their employment. This Section does not authorize the payment of legal fees for those persons bringing the action.

(PX 29.) Alderman Burke's March 16 letter similarly explained, "I have not found any language in the Municipal Code to authorize the Committee on Finance to pay the fees of outside lawyers hired to sue the City of Chicago, its officials and employees." (PX 30.)

The court is not persuaded that Alderman Burke's letters provide a rational basis for the City's decision not to pay Plaintiffs' legal expenses. It is undisputed that the City paid such expenses on behalf of the *Roti* aldermen when they sued the City, and that Lisa Ruble-Murphy was aware of that fact when she drafted Alderman Burke's letters to Alderman Bloom. (Tr. 777.) The City's plaintiff/defendant distinction is, thus, unavailing. For the reasons already explained, the fact that Plaintiffs were also suing as voters similarly fails to explain the City's decision to pay the *Roti* plaintiffs' attorneys' fees but not those of Plaintiffs in this case. Indeed, Alderman Burke's February 16 and March 16, 1993 letters never mentioned, much less attempted to distinguish, the *Roti* cases. Nor is the differential treatment between the Opposition Aldermen, who were plaintiffs in *Smith I*, and the Administration Aldermen, who intervened in that case, justified because Plaintiffs were opposing the Referendum Map. As Judge Plunkett noted, "[t]hat explanation — we only pay the legal fees of aldermen-plaintiffs if we deem the cause worthy — is virtually an admission that the City does not apply the fee payment ordinances in a content-neutral fashion." *Smith*, 2002 WL 1770532, at *11. Significantly, Alderman Preckwinkle testified that Alderman Burke expressly agreed to consider paying Plaintiffs' legal fees if they would settle with the City. (Tr. 85-86, 90.)

Similarly unavailing is the City's suggestion that the availability of attorneys' fees to Plaintiffs if they prevailed in the remap litigation distinguishes them from the *Roti* plaintiffs, who did not have such fees available to them. In the event Plaintiffs lost, the City had no intention of paying any of their attorneys' fees though reimbursement would not have been available to them as prevailing parties. On the other hand, the City was willing to pay the *Roti* plaintiffs' expenses both when they

prevailed in *Roti I* and when they lost in *Roti II*. (Tr. 19-20.) As for any concern about double recovery in the event Plaintiffs won the remap litigation, there can be little doubt that the City would only have been required to reimburse those expenses that it had not yet paid.

The City claims that in light of *Kinzer v. City of Chicago*, 169 Ill. App. 3d 447, 523 N.E.2d 919 (1st Dist. 1988), *aff'd in part and rev'd in part*, 128 Ill.2d 437, 539 N.E.2d 1216 (1989), its unwillingness to pay Plaintiffs' legal fees was borne of concern about a possible taxpayer action for recovery of funds that were improperly expended by the City. (Def. Tr. Brief, at 13.) In *Kinzer*, a taxpayer sued the city and its comptroller for expending funds "without an appropriation being made therefor by the city council." *Id.* at 449, 523 N.E.2d at 920. Specifically, the comptroller created a special fund to pay for a festival called "ChicagoFest," which created liabilities against the city's general fund that had not been approved by the City Council. *Id.* The court found that this was unlawful: "Since Fund 666 is not a special one, its contrivance by administrative officials made any moneys therein, perforce, part of the general funds of the City, and any expenditures from the fund were legally required to be made only through the appropriations process." *Id.* at 455, 523 N.E.2d at 924. *Kinzer* is easily distinguishable from this case because the City did make a prior appropriation for payment of legal fees and, moreover, used those appropriations to reimburse the Administration Aldermen. Any claimed concern about a taxpayer lawsuit under such circumstances is without merit.

The City next argues that a government has a right not to remain neutral in litigation relating to its laws. (Def. Reply, at 22) (citing *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995)) ("when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"). Plaintiffs did not, however, ask the City to remain neutral in the litigation, much less support their viewpoint; they simply asked that the fee payment ordinances be applied in a consistent manner. Contrary to the City's suggestion, the City is not, as a general principle, required to "underwrite each and every lawsuit that challenges a City

28

law." (Def. Reply, at 22.) Indeed, as written, § 2-152-170 applies only where an action is instituted *against* an alderman.[7] Regardless of the ordinance's "proper" interpretation, however, the City, which voluntarily chose to reimburse the *Roti* aldermen notwithstanding their status as plaintiffs, and to reimburse the Administration Aldermen when they voluntarily intervened in the remap litigation, must now live with those decisions and treat other plaintiff-aldermen in like fashion. *See Smith*, 2002 WL 1770532, at *8 ("the question is not whether the City's interpretation is correct, but whether the City adheres to that interpretation, regardless of the . . . political views of the official seeking payment of legal fees").

### c.    "True" Defendant Status

The City acknowledges that Plaintiffs were named as defendants in *Barnett* but argues that they were not truly acting as defendants in that litigation. "[T]he actions taken by the *Smith* plaintiffs during [the time they were defendants] were not the actions of a true defendant, but rather were part of a sham defense." (Def. Reply, at 20; Def. Mem., at 9.) Once again, this argument ignores the fact that the City paid the legal expenses of the *Roti* aldermen when they were acting as plaintiffs and of the Administration Aldermen when they intervened in *Smith I*. In addition, the court is not persuaded by Lisa Ruble-Murphy's testimony that she did not believe Plaintiffs were entitled to reimbursement because "[t]here was no way that Mr. Miner was defending the Referendum Map." (Tr. 747-48.) Ruble-Murphy also testified that she knew the *Roti* aldermen had received reimbursement when they were acting as plaintiffs. (Tr. 777.) To the extent Ruble-Murphy believed Plaintiffs could only be reimbursed if they supported the City's position on the Referendum Map, (Def. Reply, at 20), she is essentially admitting that the City applied the fee

---

[7]    Plaintiffs have offered some evidence that the City paid the legal expenses in *Roti* and certain other cases from sources besides § 2-172-150, and argues that the City similarly could have paid Plaintiffs' legal fees from those other sources. (Plaintiffs' Post-Trial Memorandum (hereinafter "Pl. Tr. Brief"), at 48-58.) Given the City's exclusive reliance on that statute, and given the court's conclusion that the City applied § 2-172-150 unequally with respect to Plaintiffs, the court need not consider other potential sources of payment.

payment ordinances unequally, supporting only those causes it deemed "worthy." *See Smith*, 2002 WL 1770532, at *11.

### d. Equal Protection Liability

The City finally urges that if it had funded Plaintiffs in the remap litigation, the *Barnett* and *Bonilla* plaintiffs could have asserted equal protection claims unless the City similarly funded their lawsuits. (Def. Reply, at 22.) This argument is a non-starter. None of the other plaintiffs in *Barnett* or *Bonilla* was also an alderman even arguably eligible for reimbursement under the relevant fee payment ordinances. In other words, the *Barnett* and *Bonilla* plaintiffs were not similarly situated to Plaintiffs for purposes of asserting an equal protection claim based on the non-payment of aldermanic legal fees. *See Schroeder*, 282 F.3d at 950.

### 3. Rational Bases – Aldermen Watson, Munoz, Haithcock, and Garcia

The City insists that it treated Aldermen Watson, Munoz, Haithcock, and Garcia fairly with respect to attorneys' fees because it treated them the same as all the other Plaintiffs. (Def. Reply, at 23.) Because the City's arguments for denying all Plaintiffs their fees fail, for the reasons already stated, this argument also fails. The City argues that Alderman Burke provided a rational basis for denying the fees of Alderman Munoz; namely, he was not a member of the City Council at the time of the redistricting process. (Def. Reply, at 24; Tr. 372-73.) The problem with this argument is that Alderman Burke did not give a similar explanation to Alderman Watson. (PX 32, Letter from Burke to Watson of 3/16/93) (§ 2-152-170 "authorizes appointment of private counsel only to defend against an action brought against an official or employee"). Nevertheless, to this court's knowledge, Aldermen Watson and Munoz never actually joined the remap litigation and never incurred any attorneys' fees in that regard. Accordingly, they are entitled only to nominal damages. To the extent Plaintiffs failed to offer any evidence at all regarding Alderman Haithcock, her request for relief is denied.

With respect to Alderman Garcia, the City did agree to pay part of his legal fees. (Tr. 757-58.) The City declined to reimburse $7,000 in additional fees, however, on the basis that the work was being done as a sham defense while Alderman Garcia was acting as a plaintiff. (Tr. 758.) The court has already rejected this distinction and finds that Alderman Garcia was treated unequally with respect to the payment of his attorneys' fees in this case and is entitled to reimbursement.

III.    **Relief**

Plaintiffs seek to recover $246,354.07 in unpaid legal expenses. (Pl. Tr. Brief, at 65-72.) The City does not respond to Plaintiffs' itemization other than to argue elsewhere in its briefs that the City should not have to reimburse expert fees because it did not share experts in common with Plaintiffs. (Def. Mem., at 3.) It is undisputed that the Administration Aldermen's counsel paid for the experts and then obtained reimbursement from the City. (Tr. 584-85.) The court sees no reason why Plaintiffs should not be similarly reimbursed for their expert fees. Plaintiffs' request for $246,354.07 in unpaid legal expenses is granted. Alderman Garcia is entitled to recover $7,000.00. Aldermen Watson and Munoz, in turn, are entitled to nominal damages.

## CONCLUSION

For the reasons stated above, the City's Motion for Judgment as a Matter of Law on Partial Findings (Docket No. 206-1) is denied and judgment is entered in favor of Plaintiffs in the amount of $246,354.07.

ENTER:

Dated: June 10, 2004

REBECCA R. PALLMEYER
United States District Judge

31